Lena M. Buchwach v. Commissioner.
Buchwach v. Commissioner
Docket No. 18564.
United States Tax Court
1950 Tax Ct. Memo LEXIS 93; 9 T.C.M. (CCH) 835; T.C.M. (RIA) 50229; September 22, 1950
*93 Petitioner's income determined on the so-called bank deposit basis. Fraud penalties not sustained. Negligence penalties imposed. Garthe Brown, Esq., Public Service Bldg., Portland, Ore., Randall S. Jones, Esq., and Robert T. Jacob, Esq., for the petitioner. William E. Koken, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax and penalties for the calendar years 1942, 1943, 1944, and 1945 in the following amounts: 50% Penalty
Year
Deficiency
for Fraud
1942
$ 389.11
$ 194.56
1943 [1]
2,541.73
1,270.87
1944
1,378.78
689.39
1945
519.00
259.50
Total
$4,828.62
$2,414.32
*94 By way of amended answer, respondent subsequently adjusted the deficiencies and penalties originally determined as follows: 50% Penalty
Year
Deficiency
for Fraud
1942
$ 285.87
$ 142.94
1943
3,474.34
1,737.17
1944
1,204.78
602.39
1945
None
None
Total
$4,964.99
$2,482.50 As an alternative to the additions to tax for fraud, respondent in the amended answer claims so-called five per cent negligence penalties in each of the years 1943 and 1944. The first issue is whether respondent was justified in redetermining petitioner's net income for each of the taxable years in question on the basis of her total bank deposits. Depending upon our determination of the first issue, the following questions arise: (1) Whether petitioner understated her correct net income in her income tax returns for each of the calendar years 1942, 1943, and 1944. (2) Whether any part of any deficiency in the petitioner's tax for the years in question was due to fraud with intent to evade tax or, in the alternative, due to negligence or intentional disregard *95 of the Commissioner's rules and regulations. (3) Whether, in the absence of fraud, the assessment of a deficiency for the calendar year 1943 is barred by the statute of limitations. This case was submitted upon a partial stipulation of facts, oral testimony, and documentary evidence. Findings of Fact Lena M. Buchwach, hereinafter referred to as the petitioner, is an individual residing at 634 S. W. Harrison Street, Portland, Oregon, whose Federal tax returns for the calendar years 1942, 1943, 1944 and 1945 were filed with the collector of internal revenue for the district of Oregon. Petitioner immigrated to the United States in January, 1913, and since that time has been a resident of Portland. In June, 1913, petitioner was married and four sons, Irvin, Lewis, Saul Bob, and Aaron, were born of this marriage. Petitioner's husband, prior to his death on July 6, 1939, operated a secondhand clothing store in Portland under the name of M. Buchwach. After the death of petitioner's husband, her eldest son, Irvin, operated the store for his mother under the name of United Exchange Store until the latter part of 1942 when he was hospitalized. At this time the petitioner, who had little *96 formal education and no business experience, took over and thereafter personally operated the business at United. Irvin did not return to United upon his discharge from the hospital. In 1943, he entered the armed services and 60 days thereafter was released with a medical discharge. On or about October 1, 1943, Irvin and his wife, Celia, purchased United from the petitioner for $5,000, which amount was secured by a promissory note and paid during 1943 and 1944. In November, 1943, petitioner purchased a clothing store from one Mary Sax for $4,250, payment being made with $1,750 in cash and a mortgage in the amount of $2,500. The purchase price was subsequently reduced by agreement between the parties to the sum of $4,100. Petitioner operated this store under the name of Reliable Workman Store, hereinafter referred to as Reliable, and dealt exclusively in new clothing. On June 5, 1945, petitioner was hospitalized as a result of a head injury sustained in a hold-up. Petitioner did not thereafter resume her business at Reliable and in August, 1945, sold the entire stock of goods to Irvin for $1,500. During 1942 and prior to the date of his hospitalization, Irvin maintained a record *97 of purchases, sales, and expenses incurred in the operation of United in a five cent notebook. When petitioner took over United she made a daily list of receipts and expenditures. Purchases of second-hand clothing were made with cash taken from the till and a record thereof made for police purposes. All new merchandise was purchased by check. A list was kept of expenditures made for new merchandise, utilities, garbage and cleaning. Petitioner maintained her records in the same manner during the period she operated Reliable in 1944 and 1945. Petitioner has been unable to locate her business records for the years in question and the only record of her business activities existing at the time of the hearing consisted of substantially all her cancelled checks and bank statements for the last two months of 1942 and the years 1943, 1944, and 1945. During the years in controversy, petitioner maintained several bank accounts in the First National Bank of Portland. Prior to January 1, 1942, and thereafter until November 22, 1943, an account was carried in the name of United, and from and after November 17, 1942, another account was maintained in the petitioner's name. On December 31, 1943, an *98 account was opened in the name of Reliable, which petitioner thereafter maintained through September 12, 1945. The total amounts deposited in and withdrawn from such accounts during the years 1942, 1943, 1944 and 1945 were as follows: Deposits
Withdrawals
1942
$ 7.857.20
$ 7,529.17
1943
24,463.93
24,363.23
1944
18,183.71
18,299.85
1945
24,324.58
16,600.35
Petitioner's four sons worked from the time they were six or seven years of age and gave their earnings to the petitioner to do with as she pleased. Petitioner and her son, Saul Bob, agreed in September, 1942, that she was holding funds earned by him which he could draw against for his college expenses. The money which petitioner was holding for her children was hidden in her home until June, 1943, when it was deposited in her account at the First National Bank. During 1942, two nephews of the petitioner, David and Lipa Berez, immigrated to the United States from France and settled in Portland. David came to Portland in June or July, 1942, and Lipa in September, 1942. A third nephew, Anatone, arrived in Portland in 1944. During 1942, 1943, and 1944, petitioner assisted her nephews by advancing *99 them various sums of money for the purchase of household goods, food, and other personal items. During the years 1942, 1943, and 1944, petitioner derived income from the rental of two apartments. For a period of time during those years petitioner's son, Irvin, occupied one of these apartments without the payment of rent. Depreciation in connection with this property in the amount of $180 was claimed by the petitioner on her 1942 income tax return. No depreciation was claimed by the petitioner in her returns for 1943 and 1944. Petitioner's income tax returns for the years in question were prepared by one of her acquintances from her bank statements, her lists of sales, purchases, and expenses, and other records, and in the case of her 1943 return, a profit and loss statement probably prepared by Celia at the time she and Irvin purchased United from the petitioner. The statement prepared by Celia was compiled from the petitioner's bank deposits, bank statements, invoices, and lists of expenditures. Petitioner's 1942 income tax return filed on March 11, 1943, disclosed gross receipts totaling $5,803.57, consisting of business receipts from United in the amount of $5,173.57 and gross *100 rental income of $630. No inventory as of the beginning of 1942 was shown on the return. Merchandise purchased was listed at $3,292.33, and the closing inventory at $1,012, resulting in a figure of $2,280.33 representing the cost of goods sold. Business expenses in the amount of $1,579.40 were claimed, resulting in a net profit from United of $1,313.84. Petitioner reported a net income from all sources in the total amount of $1,425.44. Respondent reduced petitioner's total bank deposits for 1942 from $7,857.20 to $7,357.20 in order to reflect an interbank transfer of $500 and has held that the difference between $7,357.20 and the reported gross income of $5,803.57, or $1,553.63, constituted an understatement of income for the year. This amount respondent added to the reported net income of $1,425.44 to arrive at an adjusted net income of $2,979.07 for the year 1942. Included in the petitioner's total bank deposits for the year 1942 were non-income deposits in the amounts of $100 and $200 which represented funds redeposited by the petitioner that she had advanced from her bank accounts to her nephews and to other persons, respectively, during 1942 and which were repaid to her during *101 that year. The business at United had an opening inventory for the 1942 in the amount of $400. Petitioner's taxable net income for the calendar year 1942 was $2,279.07. Petitioner, in her income and victory tax returns for 1943 filed on March 15, 1944, reported gross receipts totaling $10,982.73 consisting of business receipts of $10,562.73 and gross rental income of $420. Cost of goods sold was reported as $8,867.25, resulting in a net profit from the business of $1,695.48. An opening inventory of $1,012 and a closing inventory of $5,000 was shown on the return. Petitioner reported net rental income of $101.44 and total income and victory tax net income of $1,796.92. Respondent adjusted petitioner's total bank deposits of $24,463.93 in 1943 downward to $21,819.36 to reflect certain conceded non-income deposits. Respondent added the difference between $21,819.36 and petitioner's reported gross receipts of $10,982.73, or the sum of $10,836.63, and the sum of $37.50 representing a bond purchase erroneously deducted as expense by the petitioner, to the reported net income of $1,796.92, thereby determining an adjusted net income of $12,671.05 for 1943. Included in petitioner's *102 total bank deposits for the year 1943 were non-income deposits in the amounts of $200, $100 and $50 which represented funds redeposited by the petitioner that she had advanced from her bank accounts to her son Saul Bob, her nephews, and to other persons, respectively, during 1943 and which were repaid to her during that same year. Also included in petitioner's total bank deposits for 1943 was the sum of $1,450 representing money borrowed by the petitioner from her son Lewis and deposited in her bank accounts during that year. Petitioner was entitled to a deduction for depreciation on rental property owned by her in 1943 in the amount of $90. The closing inventory of the petitioner's business at Reliable for the year 1943 was $3,749.50. Petitioner's taxable net income for the calendar year 1943 was $9,530.55. In her 1944 return filed on March 13, 1945, petitioner reported total gross receipts of $12,455.71 consisting of gross receipts from her business at Reliable in the amount of $12,035.71 and gross rental income of $420. Cost of goods sold was reported as $11,043.59, based upon an opening inventory of $5,000, purchases of $13,029.62, other costs of $1,134.95, and a closing *103 inventory of $8,120.88. Gross profit from Reliable was shown as $992.12. Net rental income of $103.77 brought petitioner's reported net income from all sources to a total of $1,095.89. Respondent reduced total bank deposits for 1944 from $18,183.71 to $17,583.71 to reflect a conceded non-income deposit in the amount of $600 and added the difference between $17,583.71 and the petitioner's reported gross receipts from all sources of $12,455.71, or the sum of $5,128, to the petitioner's reported net income of $1,095.89 thereby determining an adjusted net income of $6,223.89. [2]
Included in petitioner's total bank deposits for the year 1944 were non-income deposits in the amounts of $100 and $125 which represented funds redeposited by petitioner that she had advanced from her bank accounts to her nephews, and to other persons, respectively, during 1944 and which were repaid to her during that year. Petitioner was entitled to deduction for depreciation in the amount of $90 in computing her tax liability for 1944. The closing inventory of the petitioner's business at Reliable for the year 1944 was $4,500. Petitioner's taxable *104 net income for the calendar year 1944 was $3,538.51. [3]
No part of any deficiency for any of the taxable years in controversy was due to fraud with intent to evade tax. Some part of the deficiency for each of the years 1943 and 1944 was due to the negligence of the petitioner in failing to maintain adequate business records during such years from which her correct income could be determined. The statutory notice of deficiency covering the calendar years 1942, 1943, 1944 and 1945 was mailed on March 8, 1948. Opinion ARUNDELL, Judge: Respondent has determined a deficiency in income tax and has imposed a so-called fraud penalty for each of the calendar years 1942, 1943, and 1944 on the basis of the petitioner's bank deposits. In so doing respondent has substituted total bank deposits in each year, less certain recognized non-income deposits, for the amount of gross receipts reported by the petitioner in her income tax returns. Generally speaking, the respondent accepted petitioner's figures representing the cost of goods sold, expenses, and deductions as reported on her returns. The practical result of respondent's method is to increase petitioner's reported net *105 income in each year by the difference between her reported gross receipts and the adjusted total of her bank deposits. We find no merit in the petitioner's contention that the respondent was not justified in using her bank deposits as a basis for recomputing income under the facts and circumstances in the instant case. Section 41 of the Internal Revenue Code specifically authorizes the Commissioner to compute a taxpayer's income "in accordance with such method as in the opinion of the Commissioner does clearly reflect the income" where the taxpayer has kept no accounts or the method employed does not clearly reflect the taxpayer's true income. Cf. Burka v. Commissioner, 179 Fed. (2d) 483; $2 Calafato v. Commissioner, 124 Fed. (2d) 187; Halle v. Commissioner, 175 Fed. (2d) 500; certiorari denied, 338 U.S. 949. While it appears from the testimony that petitioner did maintain years, it is clear that respondent could have seriously questioned the adequacy of such books were that question before us. However, even those records have been lost and consequently could not be produced by the petitioner when called *106 for by respondent in connection with his investigation of her returns. The only evidence of the petitioner's business activities now available consists of her canceled checks and bank statements. Under these circumstances, we find no error in respondent's reliance on the petitioner's bank accounts as a basis for the redetermination of her income. The next question is whether the petitioner in fact understated her true net taxable income in her returns for each of the calendar years 1942, 1943, and 1944. Petitioner reported net income of $1,425.44 in 1942, $1,796.92 in 1943, and $1,095.89 in 1944, whereas the respondent, under the method described above, determined her net income as $2,979.07 in 1942, $12,671.05 in 1943, and $6,223.89 in 1944. Petitioner contends that the elimination of the full amount of non-income deposits from her total bank deposits for each year and the correction of various errors in her income tax returns will show that she reported her correct net taxable income for each of the years in controversy. Initially, we shall direct our attention to three classes of non-income deposits petitioner argues may be identified and must be eliminated from her total *107 bank deposits in each of the taxable years. Petitioner argues that a large part of the amount by which her total bank deposits exceeded her reported gross receipts in each year actually represented sums in the nature of loans or advances which were redeposited by her after having been previously withdrawn and expended for the benefit of other persons and thereafter repaid to her. She maintains that the return of funds so advanced to the same bank accounts during the same year gives the false appearance of new deposits of additional income and constitutes a principal source of error in the respondent's determination. Petitioner groups such loans or advances into three categories, first, those made to her son Saul Bob; second, those made to her nephews, Lipa, David, and Anatone; and, third, those made to other persons. Petitioner contends that the amounts of $385 and $553.85 should be eliminated from her total bank deposits for the years 1942 and 1943, respectively, as sums returned to her bank accounts after having been withdrawn therefrom and paid to or for the benefit of Saul Bob during such years. Petitioner claims that these sums were repaid during the same years from the accumulated *108 life savings of Saul Bob which he had entrusted to her for safekeeping and were deposited by her in her bank deposits, there-by resulting in a duplication of deposits. The record confirms petitioner's claim that her four sons were gainfully employed at an early age and that throughout their youth turned over their earnings to her. However, petitioner's relationship with her sons in respect to their earnings appears to have been the same as that which customarily exists in many family groups and there is no reason to believe that she was strictly limited as to the use or disposition of their earnings. She possessed a clear right at all times to use the earnings of her sons as she saw fit and we believe it reasonable to assume that over the years a major portion of this money was used either for the maintenance of the family home or was returned to the sons for their own particular purposes. Petitioner has produced checks totaling $150 in 1942 and $383.85 in 1943 which appear to represent expenditures made by her from her bank accounts in those years for the benefit of Saul Bob but this evidence constitutes only the first step in establishing petitioner's case for it remains for *109 her to demonstrate that equal amounts were taken from the savings of Saul Bob and deposited in her bank accounts during the same taxable year in order to replace the sums advanced. However, petitioner has been unable to show with any reasonable degree of accuracy the amount of Saul Bob's earnings in her possession at any time, nor has she established the amount of such funds actually deposited in her bank accounts during the taxable years. Moreover, petitioner's claim with respect to 1942 is rendered totally untenable by her statement that the money she was holding for Saul Bob was not deposited in her bank accounts before June, 1943. Petitioner also claims that the sums of $300, $300, and $243.16 should be eliminated from her total bank deposits for 1942, 1943, and 1944, respectively. These amounts, petitioner contends, represent money redeposited by her in her bank accounts during each of those years which she had previously advanced from the same bank accounts to her nephews and which had been repaid by them to her during these years. Petitioner was able to produce only one check in the amount of $25 drawn in 1942 and one check in the amount of $60 drawn in 1943 which could *110 be identified as having been used for the accommodation of her nephews. Both the petitioner and her nephews testified that much larger sums had been advanced for the purchase of household items and food but as far as establishing the total amount advanced during 1942, 1943, and 1944, the date of the alleged repayment and return of the funds to the petitioner's bank accounts, the record is entirely unsatisfactory. The same situation exists with respect to the sums of $554.06, $3,137.93 and $1,852.88 which petitioner claims represent sums redeposited by her in her bank accounts during 1942, 1943, and 1944, respectively, such sums having been withdrawn by her for the benefit of other persons and repaid to her during such years. As a basis for the elimination of the amounts discussed above, petitioner, prior to the hearing, sorted the cancelled checks available for 1942, 1943, and 1944 and classified the expenditures evidenced thereby as "Transfer", "Business" and "Personal" but the record does not convince us of the accuracy of the petitioner's classification and we do not understand her to claim that she has made a positive identification of each and every check. The checks which *111 petitioner states represent expenditures made for the benefit of Saul Bob, her nephews, and other persons, which were thereafter repaid and redeposited, were labeled by her as "Transfers" and are claimed to represent the duplication of deposits. On a great number of these checks, petitioner has followed her notation of "Transfer" with a question mark or with the comment "Don't remember". Many of these same checks were drawn to the order of persons from whom she regularly purchased merchandise for her business and although a number of them bear notations which apparently refer to the purchase of goods, the petitioner has offered no explanation of her basis for distinguishing these checks from any similar checks designated as "Business" or "Personal". Some of the so-called transfer checks were dated as of the last day of the calendar year and the petitioner, with no supporting evidence, would have us believe that all such withdrawals were repaid and redeposited by her in her bank accounts during the same year. In our opinion, petitioner's estimates of sums loaned from her bank accounts which were subsequently repaid and redeposited in such accounts, given the benefit of every doubt, *112 are much too speculative to warrant their acceptance as fact. Although we have no hesitancy in accepting petitioner's testimony that she expended substantial amounts during the years in controversy for the purpose of assisting Saul Bob in his college expenses, her nephews in establishing themselves in this country, and for the accommodation of other members of her family and persons with whom she had business dealings in order to show the duplication of deposits by reason thereof, she must further establish that such amounts were in fact withdrawn from her bank accounts, the amounts of such withdrawals, the taxable year in which they were withdrawn and, finally, that such advances were actually repaid and redeposited in her bank accounts during the same taxable year in which they were made. We have examined all of the evidence with great care, including petitioner's bank statements for her several bank accounts during the taxable years, and have found it impossible to determine from these records which, if any, of the deposits made by her during the years before us represented the return of funds previously withdrawn from these same accounts and advanced to her son, nephews, and *113 other persons. On the other hand, we are convinced that some part of the amounts petitioner claims should be eliminated did follow the course she has described. Our inability to fix the precise amount of the non-income deposits which should be eliminated from petitioner's total bank deposits in the taxable years in issue stems solely from her failure to maintain and preserve complete and accurate records from which an exact determination could be made. Under such circumstances, we have no alternative but to invoke the principle established in Cohan v. Commissioner, 39 Fed. (2d) 540, which requires us to make an approximation, bearing heavily upon the petitioner whose inexactitude is of her own making. We have, therefore, found that there should be eliminated from petitioner's total bank deposits as non-income or duplicate deposits, representing the return of funds advanced to her sons, nephews, and other persons, in addition to those conceded by the respondent, the sums of $300 in 1942, $350 in 1943, and $225 in 1944. Petitioner also maintains that her total bank deposits for 1943 included non-income deposits in the amount of $5,800, representing money borrowed by *114 her from her son, Lewis, which she deposited in her bank accounts during that year. Petitioner has offered no evidence to substantiate loans in the total amount claimed other than the testimony of herself and Lewis. If we were inclined to accept this testimony as establishing the fact that loans in the amount of $5,800 were made, as claimed by the petitioner, we still must require a showing that these sums were in fact deposited in her bank accounts. Deposits in the amount of $5,800, representing the alleged loans, cannot be identified from the bank statements of the petitioner, nor do the bank statements of Lewis' savings account show withdrawals in that amount. The evidence available to us, interpreted so as to give full weight to the testimony of the parties, discloses that at most petitioner deposited money borrowed from Lewis in the amount of $1,450 in her bank accounts during 1943. This amount should, therefore, be eliminated from her total bank deposits in recomputing petitioner's net income for 1943 under the method employed by the respondent. The several other adjustments contended for by the petitioner pertain to the correction of various errors relating to the value assigned *115 to inventories and deductions claimed for depreciation in her income tax returns for the years in question. Such adjustments bear directly upon the petitioner's net income in each year inasmuch as the respondent has adopted the figures used in the petitioner's returns with the exception of reported gross receipts and one small deduction claimed in 1943. The first class of adjustments sought by the petitioner relates to the value to be assigned the petitioner's inventory at various times in determining the cost of goods sold. The petitioner points out that her 1942 return erroneously failed to disclose any value for the opening inventory at United for that year. In our opinion, it is inconceivable that United, a going business, had no inventory at the beginning of 1942 and we agree with petitioner that the estimate of $400 given by qualified witnesses is reasonable and should be accepted and reflected in the recomputation of the petitioner's net income for 1942. Petitioner contends that the figure of $5,000 reported as the value of her closing inventory for 1943 was also erroneous. We agree. Petitioner sold all of her stock in United on or about October 1, 1943, to Irvin and Celia *116 for $5,000 and in November, 1943, purchased Reliable for $4,250, which price was subsequently reduced to $4,100. The only evidence of petitioner's activities at Reliable during November and December, 1943, indicates that she made purchases of $222.40 and sales of $1,012.69. Therefore, it would appear that in no case could her closing inventory at Reliable have been in excess of $3,749.50, the amount testified to by the petitioner. In our opinion, this figure should be accepted as the closing inventory for 1943 in lieu of the $5,000 reported on petitioner's 1943 return. Petitioner further maintains that the figure of $8,120.88 reported as the value of her closing inventory at Reliable for the year 1944 was $5,000 in excess of its actual value and suggests that the figure used was the result of a typographical error or oversight. It has been shown that petitioner sold all of her stock at Reliable in August, 1945, to her son, Irvin, for $1,500. It was testified that at that time there was only half as much merchandise in the store as there was on December 31, 1945. Petitioner has attempted, on brief, to support this testimony by reconstructing the value of the merchandise handled by *117 the business during 1944. Under the method employed, petitioner added to an opening inventory of $3,749.50 all purchases made by check during the year and thereafter reconstructed sales by eliminating amounts identified as non-income deposits and rental income from total bank deposits. To reach a figure representing the cost of goods sold in 1944, the petitioner assumed that the sales so determined reflected a markup of 50 per cent. So computed, petitioner submits that she could not possibly have had a closing inventory in excess of $3,230.62. While the record establishes that the closing inventory of $8,120.88 used by the petitioner in her 1944 return was somewhat in excess of the real value of her inventory as of December 31, 1944, it does not reveal the source of this error nor the correct value of her closing inventory. Petitioner's inability to establish the correct value of her inventory at any time during the taxable years is the result of her own failure to exercise reasonable diligence and care in the maintenance and preservation of business records. Such matters as are in controversy here require reasonable exactness in their determination and it is incumbent upon petitioner *118 to substantiate her allegations of error with creditable evidence. This petitioner has wholly failed to do. However, as we believe that the figures representing the value of inventories reported by petitioner in her returns were erroneous, we must, on the basis of a completely unsatisfactory record, arrive at a reasonable estimate which in our opinion will most nearly reflect their true value. This we have done and it is our best judgment that the value of petitioner's closing inventory for 1944 was $4,500. Petitioner further argues that deductions for depreciation for the years 1943 and 1944 should now be allowed inasmuch as she was entitled to such deductions but did not claim them in her returns for those years. As best we can determine from the record, it appears that during all of the years involved, petitioner owned a building containing two apartments which she rented. However, she has provided us with none of the usual evidence required to establish a deduction for depreciation such as the original cost of the building, the date of its acquisition, and its estimated useful life. Moreover, it appears from the record that for some period of time during the taxable years in *119 question Irvin occupied one of the two apartments rent-free. On the other hand, respondent has accepted the deduction claimed by petitioner for depreciation in 1942 in the amount of $180 and on the basis of this fact and the information disclosed by the petitioner in her 1942 return, we feel that petitioner is entitled to similar deductions in 1943 and 1944, reduced to one-half, or $90, to reflect the free use of one apartment accorded to Irvin. Petitioner contends for a final adjustment involving the respondent's disallowance of a deduction for business expense in the amount of $37.50 claimed by the petitioner in her 1943 return. Petitioner concedes that this sum was used for the purchase of a bond and was not deductible, but contests the correctness of the respondent's treatment of this amount in computing the deficiency for 1944. As the respondent redetermined petitioner's net income in each year by adding the difference between her total bank deposits and her reported gross receipts to her reported net income, the only practical means of reflecting the disallowance of the deduction was to add this amount together with petitioner's reported net income to the amount of unreported *120 gross income determined. Respondent's action did not bar the petitioner from showing that this item was properly classified by her as a "transfer" payment which was repaid and redeposited during 1943. Under the method employed by respondent, his treatment of the $37.50 erroneously claimed as a deduction by petitioner was correct. Respondent contends that some part of the deficiency for each of the years 1942, 1943, and 1944 was due to fraud with intent to evade tax and, therefore, has imposed a 50 per cent addition to the tax for fraud in each year under the authority of section 293(b) of the Internal Revenue Code. In our opinion, the present record does not contain the clear and convincing evidence required to support respondent's allegation of fraudulent intent. The records petitioner maintained of her business activities during the taxable years may well have been unsatisfactory as viewed in the light of acceptable bookkeeping practices and her inability to produce such records when needed doubtless stemmed from her own negligence. But we find no evidence of a fraudulent design in these circumstances. Petitioner was uneducated and totally inexperienced *121 in business affairs when she took over the operation of United late in 1942. Her personal expenditures were modest and did not reflect a standard of living grossly disproportionate to the income reported on her income tax returns. All of her property and bank accounts were carried in her own name and the record shows that she had no undisclosed or unlawful sources of income during the taxable years. It is also interesting to note that in the amended answer respondent completely abandoned his determination of a deficiency and fraud penalty for 1945 after a full investigation of the petitioner's financial affairs for that year. However, we must approve the respondent's alternative claim for a so-called five per cent negligence penalty in 1943 and 1944 which was made for the first time in the amended answer. During the taxable years petitioner was well aware of her duty to maintain complete and accurate records of her business activities for Federal tax purposes, and although she claims to have kept records while operating United, it was apparently necessary for Celia, her daughter-in-law, to resort to petitioner's bank statements, invoices, and other data for the information used *122 in the preparation of a profit and loss statement. Nor can the petitioner find an excuse in the fact that her returns in all years were made out by someone other than herself, as those returns in no case could be any more accurate than the records she had kept and from which the returns were prepared. In our opinion, petitioner cannot now justify her failure to maintain adequate business records from which her true income could be determined and her failure to preserve such records as she had by pointing to her lack of education and experience. Therefore, the so-called five per cent negligence penalty in each of the years 1943 and 1944 should be added and collected as a part of the deficiency, as prayed for by the respondent. Our holding herein that no part of the deficiencies in tax for 1942 or 1943 was due to fraud with intent to evade tax entitles the petitioner to the benefits of the forgiveness feature of the Current Tax Payment Act of 1943. Under the provisions of this statute petitioner's tax liability for 1942 is forgiven and a deficiency will exist in her tax for 1943. See subsections (a) and (b) of section 6, Current Tax Payment Act of 1943. The running of the statute of *123 limitations on this deficiency commenced on March 15, 1944, the date petitioner filed her 1943 return. See section 275, I.R.C. As a general rule, the Commissioner is required by section 275(a) to assess a deficiency within three years after the taxpayer's return was filed. However, section 275(c) provides that where, as here, the taxpayer omits from gross income an amount in excess of 25 per cent of the gross income stated on his return, assessment may be made by the Commissioner at any time within five years after the return was filed. As the record demonstrates that the notice of deficiency in respect to petitioner's tax for 1943 was mailed within five years from the date petitioner's 1943 return was filed, the Commissioner's assessment and collection of a deficiency for that year was not barred by the statute of limitations. Decision will be entered under Rule 50. Footnotes
1. Respondent also determined a six per cent penalty in the amount of $2.31 for 1943 for underestimating the tax due.↩
2. Before allowance of standard deduction of $500.↩
3. Ebid.↩